Filed 4/29/21  P. v. Santos CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>NER BELLIN SANTOS,<br><br>      Defendant and Appellant. | A153384<br><br>(Alameda County<br>Super. Ct. No. 176167) |
| In re NER BELLIN SANTOS,<br><br>      on Habeas Corpus. | A159050 |

One morning, 17-year-old John Doe disclosed to his mother that his father had sexually abused him several years earlier, and so had his father's former boyfriend, defendant Ner Santos.  It is undisputed Doe's father had done so.  Doe revealed the abuse by the two men in a burst of anger at his father, during a quarrel with his mother over some pocket money.

Doe's father later admitted to having sexually abused his son, pled no contest to two charges in exchange for a determinate 22-year prison sentence, and testified for the prosecution against his former boyfriend.  A jury

1

convicted defendant of all five sex crimes charged against him, and he now appeals. He also brings a related petition for habeas corpus.[1]

We conclude that defendant's convictions on two counts of sodomy must be vacated, punishment on another count must be stayed, and an award of fees, fines and assessments must be reversed with directions for a limited remand. We otherwise reject defendant's contentions.

## BACKGROUND

On May 6, 2015, defendant and the victim's father were charged jointly by information, defendant with five counts:

Two counts (numbers 5 and 6) of sodomy of a person under 14 years old, and more than ten years younger, between January 16, 2009, and January 15, 2010 (Pen. Code, § 286, subd. (c)(1)[2]);

One count (number 8) of continuous child sexual abuse, between January 16, 2010, and January 15, 2011 (§ 288.5, subd. (a));

One count (number 12) of oral copulation of a person under 16 years old, between January 16, 2012, and January 15, 2013 (former § 288a, subd. (b)(2) [now renumbered as § 287, subd. (b)(2); see Stats. 2013, ch. 282, § 1; Stats. 2018, ch. 423, § 49]); and

One count (number 14) of sending harmful matter to a minor, between January 16, 2008, and January 15, 2012 (§ 288.2, subd. (a)).

Defendant pled not guilty, and the case against him proceeded to a jury trial several years later, commencing in May 2017. In the meantime, Doe's

---

[1] Previously we ordered that defendant's petition for a writ of habeas corpus would be considered with his direct appeal. We hereby consolidate the two now for purposes of decision.

[2] Unless otherwise indicated all further statutory references are to the Penal Code.

father had pled no contest to two sex offenses as part of a plea bargain to testify for the prosecution; we discuss those details below.

## I.

### *The Prosecution's Case*

#### A.    Family Background[3]

The victim, John Doe, was born in January 1997.  His parents were married for 20 years, and his home life was turbulent.  Both parents had tempers, argued a lot, and would often scream at Doe and hit him.  One of Doe's sisters also fought with him and tried to harm him, including hitting him with a bat.  Later, she tried to kill him with a knife, had a mental breakdown and was hospitalized.

Mother testified Doe's father would often lie to her during their marriage, and she knew it but was afraid to confront father about his lies because of his temper.  Doe also testified his father was untruthful and would always lie in order to be the center of attention.  Mother testified Doe would sometimes lie to her about little things, to avoid getting into trouble, but she doesn't consider him to be a liar.

In October 2003, around the time Doe was six and a half years old, his parents separated and father moved out of the family home in Hayward and went to live with defendant in San Leandro, in a small studio apartment.  At a recent church barbecue, father had introduced defendant to the family as someone he'd met at the gym and who had helped him get a job, and defendant had then come to dinner in their home.  Unbeknownst to the family, defendant and father were romantically involved.

---

[3] For reasons of personal privacy, we omit names of the victim and non-law-enforcement-related witnesses.

Mother testified that, of her three children, the divorce was hardest on Doe, who would often cry at night asking when his father would come back home. Despite the turbulence in their home, Doe felt very close to his father and his feelings remained that way even after his parents separated. She testified that the crying went on for about four years, until he was around nine years old.

Doe visited his father every other weekend. After less than a year, father and defendant moved from their studio apartment to a bigger, one-bedroom apartment in San Leandro for about a year, and Doe continued to visit him there. Then he and defendant moved to another one-bedroom apartment in San Leandro. When Doe visited father in those homes, he slept on the couch. Father testified they moved again after about a year (he couldn't recall precisely) to another apartment in San Leandro, on Franklin Street, where they stayed for about two years. Then, he and defendant moved to a one-bedroom house on Thornton Street in San Leandro (he couldn't recall the exact year). At first, Doe slept on the couch in the living room at the Thornton Street house, but later father converted the attic to a bedroom for Doe and his sister.

After some period of time, father revealed to Doe that he and defendant were boyfriends.[4] Doe shared that information with his mother who hadn't known either. She disapproved of homosexuality because of strong religious views and made her disapproval known to her children.

By the time Doe was nine, he was diagnosed with behavioral problems, began therapy for two or three years for his mental health and was prescribed medication. At around age nine or ten, when it was revealed in

_____

[4] Mother testified this was when Doe was around seven; Doe thought he was eight or nine at the time.

4

therapy his sister had been attacking him at his mother's house, Doe was removed from his mother's home and lived for several months with a couple from church.

When Doe was around 10 or 11, he became angry at and estranged from mother, and briefly went to live with father and defendant for about three months. Father testified this was when he was living in the apartment on Franklin Street in San Leandro. Mother testified she didn't want Doe to go live there but Doe threatened to make his mother's life miserable if she wouldn't allow it. When he moved back to his mother's home he continued to visit his father on weekends.

Eventually, in roughly 2010, father and defendant broke up after a seven-year relationship that had been on-again, off-again, and marked by frequent fighting. Although they continued to live at the same property on Thornton Street after breaking up, they occupied different apartments (father moved to a back unit and defendant remained in the front one),[5] had little contact with each other, and became romantically involved with other people.

Doe testified that after the sexual abuse in his father's household had ended (summarized next), he again went to live with father, this time for about a year and a half. The move was precipitated by an angry incident with his mother one day that culminated with her leaving him abandoned in South San Francisco, far from home, and it triggered a CPS investigation. Mother testified this happened when Doe was 14; Doe testified this happened in 2012, when he was 15. Doe testified he didn't want to go live with his

---

[5] The house was divided into two apartments, one in the back and one in the front with an attic which is where the men first lived together. There was also a garage area in the back that had been converted into an apartment.

5

father but felt it was his only option. After living for a year and a half at father's house, he was transitioning back to living with mother when he revealed to her he had been sexually abused.

**B.    John Doe's Revelations to His Mother That His Father and Defendant Had Sexually Abused Him**

On the morning of May 2, 2014, when Doe was 17 years old, mother confronted Doe about the amount of money she was giving him to pay his BART fare to school, because father had told her it was too much and that Doe was using the money to sell drugs. Doe testified he was using the extra BART money to support his marijuana habit. By this point, he also had tried cocaine, all of the drugs to numb the stress of what had happened to him in his father's home. He testified he was still living with his father at this juncture (after the rupture with his mother), but was in the process of transitioning back to living with his mother.

Doe testified that when his mother confronted him about the BART money and told him his father had said he was smoking marijuana, "I was really pissed that he told my secrets to my mom . . . . So I thought to myself, if he's not going to keep any of my secrets why should I keep his." According to mother, Doe then said his father was the one who was lying (and was making Doe sell drugs), he became upset and said his father had raped him and defendant had, too. Then he began crying like a baby. Doe testified he didn't remember specifically what he said, "but I told her that I was raped by my father and Mr. Santos." He also testified that if his father hadn't revealed to his mother that he was using drugs, he never would have had the courage to tell his mother about what his father and defendant had done to him.

Mother testified that at first, she didn't think Doe was being sincere and wasn't sure he was telling the truth. Doe testified she said, "you're lying,

6

you're just trying to get out of this," but then she started to believe him when she saw him breaking down in tears.

Doe was too upset to go to school and stayed at his sister's house for the day. At the end of the day, mother took him to the San Leandro police station after she got home from work.

### C. Statements by Doe and His Mother to Law Enforcement Officials

That evening, mother and Doe gave a statement to San Leandro police officer Jason Vincent, who testified he first spoke with mother, recorded a written statement from her, and then spoke to Doe alone. Vincent testified that his role was just to take a preliminary report from them and that investigators would take over the case to get more details later, and so he didn't ask for a lot of details.

Mother told Vincent about the BART fare conversation, that Doe said his father raped him and that as Doe was embracing her and she was comforting him, she felt he was being sincere because he never displayed emotions. In the written statement Vincent took from her, she reported that Doe had told her that his father had raped him and at first she didn't know if Doe was being sincere, and that both father and defendant "forced him to watch them have sex and forced him to orally copulate them."

Doe told Vincent that in 2008, when he was about 11 years old, he saw the two men orally copulating each other in front of him (though he didn't use those words), he tried to leave the room but his father told him to stay, and then his father told him to orally copulate both men, masturbate them and anally penetrate both men and he did so. Vincent testified Doe said this happened ten or more times during the three years between age 11 and 14, and although Vincent tried to get a precise number, Doe couldn't recall the

7

exact number of times it happened and just gave an approximation. Vincent testified that the last time Doe recalled was at "about" age 14.

Doe was interviewed about three days later by a specialist at CALICO, an independent entity that coordinates with law enforcement to conduct interviews of children, and he discussed the abuse in greater detail.

Doe also revealed during his CALICO interview that defendant had given him some pornographic videotapes. So, the following day he was interviewed by the San Leandro police officer who had observed the CALICO interview (police sergeant Liaquat Khan), and provided more details about the videos. Doe told Khan that one of the first things defendant had given him was a bisexual pornographic VHS tape that he recalled as having a gold label and included a scene depicting a man in army fatigues having sex with another man and a woman. Doe said his mother found out about it, so he returned the VHS tape to defendant. Doe also said defendant had given him pornographic DVDs. Based on this information, sergeant Khan executed a search warrant of defendant's home on Thornton Street, found over 100 VHS tapes in the attic, and seized five that had gold labels, including one called "Men, Mass Appeal For Everyone." The videotape and still images from it were entered into evidence.

In the three years that elapsed before the case went to trial, Doe was interviewed four to six times by an assistant district attorney and about three times by the trial prosecutor. He also testified at a preliminary hearing in April 2015. A few weeks before trial in May 2017, he was asked by a member of the prosecution team why he didn't tell his mother initially that defendant also had abused him, and he replied because he thought she would "blow." Doe only vaguely recalled saying something like that during the interview

but couldn't remember the context and testified he did think at the time his mother would "blow" at him.

Mother was interviewed one or two more times, by members of the district attorney's office. Nearly three years to the day that Doe first revealed the abuse to her, she was interviewed by the trial prosecutor to prepare for the upcoming trial, and told the prosecutor that Doe didn't initially mention defendant when he told her about the abuse. At trial, she testified that it had been a long time, was painful to think about and so she might have forgotten that fact when speaking with the trial attorney. She also admitted she has "negative feelings" about defendant and has said negative things about him to her children. She felt betrayed by him after she had welcomed him into their home.

### D.     John Doe's Testimony About the Abuse

Doe testified that when he first started visiting his father on the weekends, he got to know defendant and liked him. He thought defendant was fun and friendly, and he looked forward to going to his father's home on weekends. It was a more playful, enjoyable environment than his mother's home, which was strict and depressed. Doe would do fun things with his father and defendant, like going to the park, or the movies or out to eat. At the preliminary hearing, he testified he didn't really spend much time with defendant, and, "I didn't really know him, he was still like a stranger to me."

Doe testified that the abuse began when he was nine, when father and defendant were living in their last apartment in San Leandro before they moved to the house on Thornton Street.[6] He testified that late one night

---

[6] For much of his testimony Doe referred to the house on Thornton Street as being located on Orchard Street. Eventually it was clarified that the house was near the intersection of Orchard Street, but located on Thornton Street. We refer to it here as the Thornton Street house.

shortly before Christmas, around 11:00 p.m., the three of them were watching a television show together, SpongeBob.  The two men were seated about five feet away from him on a couch.  The only lighting was from the television and the lights on their Christmas tree.  Doe testified he saw defendant's penis get hard, and then he saw father pull it out and start sucking on it to the point of what Doe came to know was ejaculation (though at the time he didn't understand what he was seeing).  While doing this, his father asked Doe if he liked it.  Defendant didn't say anything but seemed to be enjoying it.  Afterwards, his father told Doe to keep it a secret from his mother and defendant nodded in agreement.  Doe didn't get up and go into another room because "I didn't know what to do.  I was confused."  He couldn't remember how long this lasted.  At this point, he still considered defendant a friend.

Three or four times after that, usually in the morning or "close to the afternoon," the two men also left their bedroom door open when they knew Doe was alone in the house with them, and Doe saw them having sex.  In graphic detail, he described seeing the two men naked and sweaty, engaging loudly in anal sex ("on top of each other humping").  One time he recalled his father yelling out in Spanish (translated roughly as, "what a nice 'ass,' or 'butthole' ").  Sometimes father would look over and make eye contact with Doe while this was going on.  Almost every weekend as Doe left to return to his mother's house, father would tell him not to say anything, even on weekends when Doe hadn't seen anything.  It was always the last thing his father said to him before they got in the car.

A couple of months after the abuse began, they moved to the house on Thornton Street.  The men's behavior became more frequent after the move, almost every time Doe visited.  The two men would have sex openly in front

10

of him without any regard to his presence—while on the couch, in their bed and in the shower with the bathroom door wide open.

Then, Doe's father initiated sexual contact with him.

It started one day when Doe was 11. Doe asked his father for advice about his body and the erections he was starting to feel, and father wanted to show him what to do with his penis. Father took him into the shower, showed him how to masturbate, touched Doe's penis and orally copulated Doe for about ten minutes, and made Doe stroke his own penis. Doe later testified he was most likely 12 when this happened, right around the time he was learning how to shave.

The next weekend, the same thing happened again but father also made Doe orally copulate him. Doe visited his father every weekend, and almost every visit his father would engage in inappropriate sexual activity with him. Once, his father tried to anally penetrate Doe but it hurt and he began crying, so father stopped. Father also made Doe anally penetrate him (Doe couldn't remember how many times).

Within months after father started doing these things, defendant got involved.[7] The first time was when Doe was around 11 or 12 years old.[8] Doe was in the living room watching cartoons in the middle of the day. Father, who was naked, invited Doe into the bedroom and told him "Ner wants to try that out too," and so Doe went into the bedroom. When Doe came into the room, defendant said something to him that he couldn't recall, but was

---

[7] At trial, Doe testified it was a month later. At the preliminary hearing, he testified it was about two or three months later, after about 15 incidents with his father.

[8] Doe told the CALICO interviewer he was 11. He testified at the preliminary hearing he was 12. At trial, he couldn't remember if he was 11 or 12.

naked, seemed to be in a good mood and was smiling and laughing. Doe took off his clothes, and father made him orally copulate defendant. Defendant "kept on saying that I had a hard dick," and then orally copulated Doe. Then, father made Doe orally copulate and anally penetrate him (father), and then anally penetrate defendant (which Doe described in detail at trial, down to their precise body positions, use of lubrication and the fact that his father showed him how to do it without hurting defendant).

A couple of weeks later, the same thing happened again. With his father present, Doe orally copulated and anally penetrated defendant, and defendant orally copulated Doe. Also some things happened with his father. Defendant told Doe that he liked what they were doing together, that it was fun and good and they should do it more often.

Their next encounter was weeks later (Doe couldn't remember exactly when), and it would happen every few weeks from around age 12 until he was about 15, except for periods in which the men had broken up.[9] The same thing happened every few weeks: Doe would anally penetrate both men, and sometimes there would be oral copulation too. It would always start with his father and then defendant would join in too. Doe considered telling his mother what was going on, but didn't really know what would happen, and

---

[9] At first, Doe testified he had about 20 sexual encounters with defendant in total. He later testified (albeit unclearly) that it was 20 times when he was 12 and after that, it was every few weeks. He testified he was going there every other weekend, and every time he visited something sexual happened with defendant. In closing argument, the defense acknowledged Doe testimony's that defendant was having sex with him every other week for about two years. Doe had told Sergeant Vincent incidents with defendant happened 10 or more times from approximately ages 11 to 14. Prior to trial, he had never told anyone the abuse happened 20 times.

12

he also didn't want anybody to know. "I thought people would look at me weird and she wouldn't look at me the same."

From about age 12 to 14, Doe's father was always present. But his last sexual encounter took place alone with defendant, after Doe's last sexual encounter with his father. One evening around 5:00 p.m., shortly after Doe turned 15, when his father wasn't home, defendant and Doe performed oral sex on each other in the bedroom. Doe couldn't remember who initiated it or what was said. This was their last sexual contact.

After the sexual encounters ended, Doe continued to visit his father on weekends and eventually moved in with his father in the house on Thornton Street and saw defendant every day. His interactions with defendant were "different," though. Doe wouldn't talk to defendant much anymore, and when the two men fought with each other Doe would even make faces at defendant. Doe now hated defendant because of what had happened, although he never confronted defendant about it. Doe never told anybody what had happened until May 2, 2014, when he revealed it to his mother at age 17.

Around age 11 or 12, at some point after his father had begun molesting Doe, defendant gave Doe a pornographic video depicting bisexual sex to help him masturbate, which he took to his mother's house. Doe's mother found it, and Doe lied to her and said he had got it from a friend. She took it away, but Doe found it and returned it to his father and defendant. It was an old VHS tape with a gold label. He also used to watch pornographic videos at his father's house on Thornton Street, which were kept unlocked in the bedroom.

The primary focus of Doe's cross-examination was on inconsistencies between various aspects of his trial testimony and the accounts he had given to law enforcement, the CALICO interviewer, and at the preliminary hearing.

13

Doe also was asked what "markings" there were on defendant's body, and he identified a butterfly tattoo on defendant's chest, a tattoo band on his wrist, scarring on his chest from a stab wound. He also recalled that defendant was fully circumcised.

### E.  Father's Testimony About the Abuse

Father testified he pled no contest to two charges in connection with the abuse of his son (one count of continuous sexual assault of a child under 14, and one count of sodomy of a child under 14), and he agreed to testify truthfully in defendant's case with the expectation of a 22-year prison sentence.  Later, a copy of his plea agreement was admitted into evidence and made available to the jury.  It reflects that father was facing 11 charges and pled only to two.

At trial, father corroborated the fact that both he and defendant had engaged in sexual activity with Doe, but his account greatly differed from his son's.  According to father's version of events, the abuse began when Doe was older, was much less frequent and virtually all of it was initiated by Doe.

Father testified all of the abuse happened at the house on Thornton Street, over the course of about one year when his son was 13 and ended before he turned 14.  He testified the incidents involving defendant took place over the course of about only two months, during the summertime.

Father testified he personally had only four sexual encounters with his son:  twice, his son tried to perform oral sex on him, once his son performed anal sex on him, and once at his son's request he put his son's penis in his mouth.  And defendant had only three:  twice in bed and once in the shower. In addition, father also stumbled on the two of them doing something behind a locked door one time when he came home from the store, and he thought they were having sex.  Father admitted he previously told police that he saw

14

defendant having sex with his son four or five times after the first time, and that it went on for "more than two years."

According to father, it all started one night when his son stumbled on the two men having anal sex in the bedroom. Father saw him and told him to go back upstairs to bed but Doe asked if he could "do something" with defendant. Father said no, but Doe began pleading to have sex with defendant ("can I fuck Santos"). Father continued to say no but, eventually, his son performed anal sex on defendant while defendant coached the boy on what to do and father watched from the other side of the bed. At defendant's request, father also took a close-up picture of the penetration. Then his son went back upstairs without saying anything. Nothing else happened that night.

Some days later, defendant had sex with his son a second time, again in the bedroom and in his presence. This time his son not only performed anal sex on defendant but also oral sex. In addition, defendant tried to perform oral sex on his son but stopped because the boy isn't circumcised and defendant didn't like the odor. While defendant had his mouth on Doe's penis, father put his own mouth on defendant's penis but denied having any sexual contact with his son on that occasion.

The third incident with defendant happened months later, in the shower, and this time father also took part. Father was showering and his son asked to join him, and then defendant got in the shower too. As father was scrubbing his son's back, the boy began grabbing defendant's penis and saying he wanted to perform oral sex on defendant, and so he did. Defendant used his own hand to ejaculate and finish. Then Doe told his father he wanted to try it with him too; father said no but Doe grabbed father's penis.

15

Father let him put it in his mouth but father couldn't get hard because it was his son. He denied putting anyone's penis in his own mouth.

Father also testified about three incidents involving only him and his son. One was within weeks of the first incident (father couldn't recall exactly when), when his son performed anal sex on him. Father was asleep in bed when the boy climbed into bed with him and asked to "do it" with him, "because . . . it's better to do it with you than [to] do it with somebody else." Father said no, but his son did it. That was the only time they had anal sex. Another time, the boy put his father's penis in his mouth. And another time, when the two were in the shower together, father put his mouth on his son's penis at the boy's request.

Father testified Doe stole the pornographic videotape from the attic in their house.

Father corroborated some of Doe's recollection about defendant's body. Similar to his son, he testified that defendant has three puffy scars on his chest, a tattoo on his chest and a tattoo on his arm. In addition, he testified defendant has a scar below his belly button from bladder surgery, two circular scars on his lower back, and small moles on his penis but he couldn't remember any details about them because he never paid them any attention.

Father specifically denied a number of things that Doe had testified to concerning specific details and frequency of the abuse. Nevertheless, father vouched for his son's credibility, testifying Doe had no reason to lie about his sexual encounters with the two men and was telling the truth.

### F. Prosecution Experts

A pediatric doctor, Dr. James Crawford-Jakubiak, testified for the prosecution about the various stages of puberty and the physical changes that accompany them.

16

Pediatric psychologist Dr. Anthony Urquiza, an expert in the area of child sex abuse, testified about Child Sexual Abuse Accommodation Syndrome, which he described as a therapeutic, educational concept to help therapists understand the experiences of children who have been abused, not a diagnostic tool to ascertain whether a child has in fact been abused. Broadly speaking, he testified it consists of five components: secrecy; helplessness; entrapment and accommodation; delayed and unconvincing disclosure; and retraction. Dr. Urquiza had not examined Doe, had no information about him and offered no opinion as to whether Doe had been sexually abused. We discuss his testimony in greater detail below.

## II.

### *Defense Case*

Two of defendant's cousins who at various times had lived with defendant and father both testified that Doe didn't have a good relationship with defendant, the two were never friends, and defendant was only civil to Doe because Doe was his boyfriend's son. Both cousins described conflict and arguments between the two men about Doe, mainly because Doe didn't pick up after himself and this irritated defendant who thought father spoiled Doe. One of them testified Doe wasn't respectful toward defendant and sometimes wouldn't even acknowledge him. She also testified Doe would sometimes lie about school, or things that happened at home ("[Y]ou could tell that he was just making up stories when he talks"). In addition, she testified defendant has two hole-shaped scars on his lower back, from a childhood accident when he fell from a tree onto barbed wire.

A defense investigator took photographs of defendant's penis during trial (from a poorly lit jail cell), and they were entered into evidence. The

17

investigator testified they showed a slightly raised mole on his penis, and that there were several smaller moles not depicted well in the photographs.

A former boyfriend who had dated defendant for three years (starting in June 2011), testified that defendant didn't like to be anally penetrated and that 99 percent of their sexual contact entailed oral sex. He also testified that the moles on defendant's penis depicted in photographs taken by the defense investigator were not big, were only slightly raised and that one would have to look pretty closely to see that they were raised.

After the defense rested, and over its objection, the court granted the prosecution's oral motion to amend the information to expand the time periods embraced by the two sodomy charges (counts 5 and 6) and the continuous child sexual abuse charge (count 8) in order to conform to proof, with the result that the two charges overlapped in time. As amended, the two sodomy counts charged for the period between January 16, 2008 (rather than 2009) and January 15, 2010, and the continuous child sexual abuse count charged for the period between January 16, 2008 (rather than 2010) through January 15, 2011.

## III.

### *The Jury's Verdict*

The theory of the defense, as argued to the jury in closing, was that Doe fabricated his charges against defendant because he blamed defendant for his parents' divorce. Primarily, defense counsel stressed inconsistencies in Doe's testimony compared to the prior statements he had made to police, prosecutors and during the preliminary hearing, and also the fact that Doe's version of events was largely contradicted by his father, whose testimony didn't help the prosecution and if anything helped the defense, but who had to implicate defendant to some degree because of his plea agreement. The

defense also stressed Doe's inability to recall the scarring on defendant's lower back or the moles on his penis, which should have been evident during the sexual encounters Doe described. To a lesser degree, defense counsel also argued Doe's relationship with defendant was never as friendly as Doe made it out to be on direct examination, and that several witnesses questioned his truthfulness.

The jury deliberated for slightly less than a day and returned a verdict (on the afternoon of June 2, 2017) of guilty on all counts.[10]

The jury submitted three requests, none discussed in open court on the record. About an hour into deliberations on the first afternoon, it asked for a copy of all exhibits, Doe's testimony and his father's testimony, adding that it intended to narrow the testimony request after reviewing the exhibits. The following morning, a second note posed two questions. The jury asked for the "legal definition/consequences" of a "no contest" plea, adding that the inquiry related to "defense item B" (father's plea agreement)), and it also asked for information relating to the dates of the two sodomy counts (numbers 5 and 6).[11] About twenty minutes later, the foreman notified the court that an answer to part b was no longer needed, and the court then conferred with counsel off the record and answered part a, advising the jury that a "no contest" plea is the same as a guilty plea. About an hour later, at 12:15 p.m., the jury sent out a third note before taking an hour and a half break, asking for clarification about a portion of the jury instructions concerning the

---

[10] The jury deliberated for less than an hour on the afternoon of June 1 and then until about 3:20 p.m. on June 2.

[11] The latter stated, "Please clarify if the dates in count 5 and 6 (1/16/08-1/15/10) restrict the finding of guilt given that the law says 'other person was under the age of 14 years.' John Doe would be 11-13 inclusive in that date range."

19

harmful matter distribution charge under section 288.2. After conferring off the record with counsel, the court wrote back, "I cannot clarify the wording." About forty minutes later, the jury returned its verdict.

Defendant was sentenced to 17 years and four months in prison, with 1,509 days of credit for time served.

This timely appeal followed.

## DISCUSSION

### I.

### *Issues Concerning Father's Plea Agreement*

Defendant raises a series of errors that he argues, individually and collectively, left the jury with an incomplete and misleading understanding of the precise details of the sentence Doe's father believed he was avoiding by entering into a plea agreement with the prosecution. These errors, defendant contends, were prejudicial because they impaired defendant's ability to effectively impeach father's credibility.

Relatedly, in his companion habeas petition, defendant argues the prosecutor violated both her *Brady* obligations and due process by failing to disclose to the defense and to the trial judge what father was told at his change of plea hearing about his maximum potential prison sentence. He raises related claims of ineffective assistance of counsel.[12]

---

[12] Because we are resolving all of defendant's claims on the merits, including the others discussed in the remainder of this opinion, those aspects of his habeas petition asserting counsel was ineffective by failing to preserve certain errors are moot.

## A. Background

Father was charged initially with 11 sex crimes, with special allegations that could have subjected him to discretionary full-term consecutive sentencing (§ 667.6, subd. (c)).

The change of plea hearing at which he pled no contest to two of the charges in exchange for a 22-year prison sentence took place on November 4, 2016, about six months before the commencement of defendant's trial. It was conducted by a different judge than the one who presided over defendant's trial. The prosecutor who tried this case against defendant was present.

Before accepting father's plea, the judge advised father of his maximum potential exposure as follows:

"Your minimum if you were convicted, otherwise if you went to trial without this agreement and you were convicted, the minimum would be 15 years to life if you're convicted of everything. *The maximum would be well beyond your natural life-span.* [¶] So if you're convicted of everything and the judge gave you the maximum, *you would die in prison.* The minimum if you are convicted of everything would be 58 years to life. So this agreement would allow you to plead, if you comply with the terms of the agreement in terms of testifying and everything else, it would be 22 years as recommended by the DA if the judge accepted that." (Italics added.)

The subject of father's 22-year plea deal and the sentence he potentially avoided then arose at numerous junctures during defendant's trial.

The first time was during defense counsel's opening statement, which drew an unspecified objection by the prosecutor:

"Now, due to the numerous inconsistent statements of John Doe, [father]—[father] who was essentially facing life in prison was given a deal, 22 years. [Father] who groomed his toddler to be molested. [Father] who had

21

his son orally copulate him, admittedly orally copulated his son.  [Father] who had his son sodomize him for years.  He's [*sic*] incentive when [Father] takes the stand is obviously he wants to get out of state prison in 22—less than that because he's been in custody for three years, but he wants to get out of state prison.  So, he will testify to whatever he believes will be helpful, and it's interesting because the prosecution gave him a deal, yet the prosecution stood before you and called him selfish, disgusting and minimizing his role.  That doesn't sound like a very credible witness to me.  And when you look at [Father], when you hear his role, his testimony will it be minimizing?  Yeah.  [Father] is not someone that can tell the truth.  Yet, he was given a benefit.  Life in prison or 22 years.  He chose the 22 years—

"[Prosecutor]:  I'm going to object, there's no—

"The Court:  Overruled.  Proceed, Counsel.

"[Defense Counsel]:  So, with regards to what he chose, he chose the benefit of 22 years.  Once you've reviewed all of the evidence, and again, keeping an open mind until the end of the case, I think the logical conclusion, the only conclusion can be that [defendant] is not guilty of the allegations as charged."

At the end of that day's proceedings, after the presentation of evidence had begun and the jury had been excused for the day, a colloquy took place about the prosecutor's objection:

"The Court:  At the end of defense's opening statement, the DA had interposed an objection during the opening statement objecting to the term 'life.'  I had assumed it meant in the vernacular sense that he would spend the rest of his life.  This wasn't a life-top case.  [The prosecutor] indicated to me that she felt it conveyed to the jury an indeterminate sentence of life imprisonment.  I am inclined to give some type of curative instruction but I

need to know what the determinant maximum was and then I would be more than happy to give that curative instruction to the jury. Might get lost in the shuffle. And I assume at some point when [father] testifies as part of his plea negotiation, I assume the max would be subject to fair game for cross-examination. [¶] So, have you figured out what the max was, [Prosecutor]?

"[Prosecutor]: No, I haven't left the courtroom.

"The Court: Okay.

[¶] . . . [¶]

"[Defense counsel]: So, your Honor, I did put in there essentially life and I was not talking about a life sentence, so I understand the Court's curative and we can discuss this more when the Court's—but I would also put in how old [father] was because I believe if he were to be convicted, it would essentially be a life case for him.

"The Court: Well, I see it somewhat as a minor point. I guess I feel like maybe I should have sustained the objection looking back in this retrospect. I think it's somewhat of a very minor point whether it—I just agree with [the prosecutor] now that I think about that indeterminate life sentence as opposed to factually a life sentence if this were 60- or 80-year sentence or whatever for the number of charges he faces. So I think a curative instruction would be appropriate, although I think subsequently it really is somewhat moot because [father] will get crossed on it any way."

The following morning, before the evidence resumed, the court gave a curative instruction:

"The Court: One other point I did want to clear up, once again, both counsel are professional and very ethical. In [defense counsel's] opening statement she referred to essentially life or life. I just wanted a clarification, this is not—first of all you're not to consider penalty or punishment.

23

"Secondly, both counsel would agree that this is not a life case.  I meant, I, as a judge, I cannot give life imprisonment in this type of case, so that is not an option.  She was using it more in the sense of essentially life or a long period of time in prison, so it's not a life penalty case."

Father later testified.  The prosecutor did not elicit any testimony about the maximum potential exposure father faced had he not pled to 2 of 11 charged sex offenses, and defense counsel did not cross-examine him about that subject nor, indeed, about any aspect of his plea agreement.

## B.    Defendant's Claims

Defendant now raises seven errors, four in his direct appeal and three in his habeas petition.

On appeal, he contends there were two separate errors in the curative instruction the trial court gave after the prosecutor objected to defense counsel's opening statement:  one, the court erred by instructing the jury that it should not consider penalty or punishment, because in context the jury would have understood this as an instruction to disregard father's motivation for testifying, and, second, the court erred in instructing the jury father could not have been sentenced to life in prison, because before father entered his plea he was essentially told that he could have been (were he to receive the maximum sentence).  This, he argues, undercut his theory that father was motivated to testify against him to obtain a "much more lenient sentence and avoid the possibility of a life sentence that would ensure he died in prison." Each instructional error, defendant argues, not only violates state law but also his constitutional rights to due process and a fair trial, as well as his right to present a defense and to confront and cross-examine witnesses.

Defendant argues, third, that his constitutional rights also were violated when the prosecutor did not inform the trial court during the

24

colloquy out of the jury's presence that father had been told at his change of plea hearing he *did* potentially face a life sentence, an error that defendant argues resulted in the trial court giving the misleading and erroneous curative instruction.

Fourth, he contends his counsel was ineffective by failing to cross-examine father about the maximum potential sentence father faced had he not entered a plea and agreed to testify.[13]  Individually and collectively, defendant argues, these errors left the jury with the impression that father was *not* facing a maximum life sentence and that, in any event, the jury could not consider the penalty he would have received absent the plea deal.

In his petition for habeas corpus, supported by a declaration of defense counsel, defendant argues the prosecutor violated *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) by failing to inform defense counsel of what was said at father's change of plea hearing about father's maximum potential sentence and, alternatively, that defense counsel was ineffective for failing to obtain the hearing transcript and learn what father had been told.  He also argues the *Brady* error was compounded by the prosecutor's misconduct at trial, when she objected to defense counsel's attempt in opening statement to argue that father's plea allowed him to avoid a life sentence, and then failed to correct the trial court's misimpression that father did not enter into the plea agreement to avoid a life sentence.

---

[13]  Defendant also raises an ineffective assistance of counsel claim regarding his counsel's failure to object to the curative instruction, preserving that claim of error.  It is unnecessary for us to address that ineffective assistance claim because we are not resolving defendant's claims of instructional error on the basis of forfeiture.

## C.    Analysis

Several errors defendant raises present serious questions.[14]  It is unnecessary to decide whether any error occurred, however, because even under the prejudice standard most favorable to the defense, defendant was not prejudiced by any of them.  In the context of this record, all of the claimed errors defendant has raised were harmless beyond a reasonable doubt, both individually and collectively.  (See *Chapman v. California* (1967) 386 U.S. 18, 23-26; see also *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684 [6th Amendment violation of defendant's opportunity to impeach a witness for bias is subject to *Chapman* harmless-error analysis]; *Strickland v. Washington* (1984) 466 U.S. 668, 695 [in claiming ineffective assistance of counsel, defendant must show "reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt"]; *In re Sassounian* (1995) 9 Cal.4th 535, 544 [*Strickland* "reasonable probability" standard incorporated into materiality element of *Brady* claim].)

---

[14]  The *Brady* claim is not one.  The prosecutor's failure to disclose what occurred at father's change of plea hearing did not constitute a suppression of evidence under *Brady*.  Defendant's counsel could have attended that hearing (but did not) and/or could have procured a transcript of it.  The People cite the principle that " 'when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim' " (*People v. Morrison* (2004) 34 Cal.4th 698, 715), and defendant cites no authority to the contrary.  (See also *People v. Osuna* (1969) 70 Cal.2d 759, 767 [prosecutor did not suppress evidence because facts were "a matter of record readily available to the defense"].)  Defendant contends the prosecutor's objection at trial took this case outside that rule but cites no legal authority to that effect nor offers any reasoned explanation as to why.  He also contends the publicly available nature of the information is irrelevant because the trial court had ordered the prosecution to provide the defense with *Brady* material, but that is circular logic and presupposes the information falls within *Brady*.

Preliminarily, we note the issues defendant has raised (both on direct appeal, and in his habeas petition) at most affected only one of the five charges of which he was convicted. This is so, first, because father testified in a manner that was favorable for defendant on two of the charges; hence, additional impeachment of father would not have aided defendant with regard to those charges. Specifically, the crime of continuous sex abuse entails three prohibited acts "over a period of time, not less than three months in duration." (§ 288.5, subd. (a).) Father testified that all of the sexual encounters between defendant and Doe took place within about a one- to two-month period when Doe was 13, which if believed would have exonerated defendant on that charge. Father's trial testimony also would have exonerated defendant of distributing harmful material to his son (former § 288a, subd. (b)(2)), by testifying that Doe found the pornographic videotape in the attic and "stole" it on his own. Because father testified in a manner that if believed would have exonerated defendant, the claimed errors regarding impeachment of father could not have infected defendant's conviction on those two charges. Second, the People agree for unrelated reasons that the two sodomy convictions must be vacated (because, as discussed below, they improperly overlap with the conviction for continuous sex abuse). Any error as to those charges is now moot. As a result, evaluating the impact of these errors on defendant's conviction is required only for defendant's conviction of the charge of oral copulation of someone under 16.

But regardless whether the errors affected one or all of the charges, our conclusion is the same: beyond any reasonable doubt, they did not affect the jury's verdict.

Even though the jury did not know the precise details of the potential maximum sentence father was told his plea would avoid, the jury was well aware he had a strong incentive to testify favorably for the prosecution, and was specifically aware that, without this plea agreement, he was likely facing the prospect of spending most of his life—if not all of it—behind bars. This was not kept from the jury, nor was the jury prevented from considering that fact in weighing father's credibility.

The trial court itself told the jury father was "essentially" facing the prospect of life in prison had he not pled to two counts in exchange for an agreement to testify. Although its curative instruction told the jury (misleadingly, in the defense view) that "I cannot give life imprisonment in this type of case" and "it's not a life penalty case," the court also instructed the jury that defense counsel's reference in her opening statement to a life penalty was meant "more in the sense of *essentially life or a long period of time in prison*." (Italics added.) In assessing father's credibility, the jury in all likelihood would have been utterly indifferent about the technical sentencing distinction between an indeterminate sentence of life imprisonment and a determinate sentence of such length that it amounted to life imprisonment ("essentially life").

In addition to the court's comments, the jury also most likely would have inferred from the evidence that father could have spent "essentially" the rest of his life in prison had he not entered to his plea bargain.

Father's plea waiver form, which we know from one of the jury's notes the jury clearly examined, reflects father was 55 years old when he pled to a 22-year prison term.[15] So the jury knew that *even under the plea bargain*,

_____

[15] The plea waiver form recites both father's birthday and the date of his change of plea hearing.

28

fathers' prison term could extend well into his elderly years (potentially until around age 77). The only reasonable inference a jury could draw from the fact that additional charges against him were dismissed is that his sentence would have would have been even longer, and he would have been even older upon its completion (if he even lived), had he not agreed to testify for the prosecution.

In addition, the specific details reflected on the plea waiver form shed light on the extent of the leniency father was receiving. The jury knew from that document father was charged with 11 enumerated counts and pled guilty to only two: a section 286, subdivision (c)(1) charge which the jury would know from the instructions was sodomy with a child under 14, and a section 288.5, subdivision (a)(1) charge which the jury would know from the instructions was continuous child sexual abuse.[16] The only reasonable assumption a layperson could make is that had father been convicted of all eleven counts—more than five times as many sex crimes as he pled to—his sentence would have exceeded 22 years *by a considerable margin*. In fact, applying simple math, a reasonable lay assumption would be something on the order of approximately 11 years (on average) for each additional offense— or, about 99 more years on top of the 22. Based on the number of charges

---

[16] The nine dismissed charges, which were identified on the plea waiver form by their Penal Code citations, included: three additional sodomy charges (§ 286, subd. (c)(1)), one charge under section 288, subdivision (a) (lewd act on a minor), one charge under section 288.2 which the jury would know from the instructions was distributing harmful materials to a minor, three charges under section 286, subdivision (b)(2) (sodomy with a child under 16) which the jury could infer from the instructions on sodomy with a child under 14 (§ 286, subd. (c)(1)) was a related sodomy charge under the same statute, and one charge under section 288.4 (lewd or lascivious acts with a child under 14) which the instructions did not define.

alone (and regardless of father's age), the jury most likely would have inferred father was potentially facing spending the rest of his life in prison.

These inferences were in fact made explicit by defense counsel in closing argument, who argued at length that father's plea agreement incentivized him to lie. After emphasizing that father's testimony contradicted Doe's in various ways, she then argued the reason father was given a plea deal is because Doe was not to be believed: "If you believe John Doe, then [father] should never have been given a deal, right? He's the one that allegedly started it all. He's the one that allegedly masturbated his son. He's the one that started grooming him at a young age. Why give him a deal? Because you don't believe John Doe and you're grasping at what [*sic*] evidence. John Doe is contradicted in every way by [father]."

Defense counsel then turned to the specifics of father's plea waiver form, reminding the jury the document was admitted into evidence and "so you're going to have his plea agreement." Directing the jury's attention to that document, she then asserted—without objection or contradiction by the prosecution, and despite the court's curative instruction at the beginning of the case to "disregard punishment"—the following: "He pled to two counts for 22 years, meaning given his age he will *most likely* get out on bail—on parole. *Without this plea agreement and facing ten charges, [father] may not have ever been out of custody which is why he accepted it*." (Italics added.) Then after some additional remarks, defense returned to the subject of the plea agreement and again emphasized that it undermined father's credibility.[17]

---

[17] She argued: "Now, why would he say something about [defendant]? *Because he has to. He has to give testimony regarding [defendant] because that's part of the plea agreement, right, to testify against [defendant*.] So, when you look at [father], as I stated[,] at his testimony, does it contradict John Doe? Yes. Does it help the prosecution? I didn't think it did. If

30

The entire thrust of defense counsel's argument, and in particular her contention that father might have spent the rest of his life in prison without his plea bargain, both urged the jury to do that which defendant claims the curative instruction told the jury not to do (disregard punishment), and was fully consistent with what father was told at his change of plea hearing: namely, that "*if* you're convicted of everything and [*if*] the judge gave you the maximum, you would die in prison." (Italics added.) Her closing argument alone therefore rendered any errors harmless beyond a reasonable doubt. (See *People v. Mincey* (1992) 2 Cal.4th 408, 463 [error in precluding cross-examination of murder accomplice about details bearing on her expectation of leniency held harmless beyond a reasonable doubt because closing arguments "sufficiently apprised" the jury of witness's potential bias]; *People v. Phillips* (1985) 41 Cal.3d 29, 48-49 [error in prosecution's failure to turn over copy of agreement it reached to procure accomplice's testimony held harmless beyond a reasonable doubt, in part because closing arguments demonstrated jury "was made well aware of the possible impact of [accomplice's] expectation of leniency on her credibility," including because defense counsel "emphatically" argued the point; "In this situation, the jury could properly assess [witness's] credibility even without testimony on a specific agreement between her attorney and the prosecution"].)

---

anything, it helped the defense more. Is [father] lying about everything? No. . . . [¶] *So, there's a plea agreement where he has to be truthful.* The impeachment part was very limited. Very limited. So, in other words, he didn't give inconsistent statements about most of his testimony. So, what do you do with that? How do you determine whether or not he's telling the truth? And that's something that if you look and take his testimony into account, his testimony limited or not, whether or not he was given 22 years, his testimony completely contradicts John Doe." (Italics added.)

In addition, the closing instructions gave the jury ample room to doubt father's credibility. The jury was instructed that accomplice testimony, while not to be arbitrarily disregarded, "should be viewed with caution." It also was instructed that, in assessing a witness's credibility, it could consider whether the witness had been convicted of felonies and whether the witness was "promised immunity or leniency in exchange for his or her testimony." As illustrated by defendant's own cited authority, although the jury did not know precise details about the extent of leniency father secured, these instructions also lessened the impact of any claimed errors that prevented the jury from learning those details. (See *U.S. v. Larson* (9th Cir. 2007) 495 F.3d 1094, 1108 [en banc] [erroneous refusal to permit prosecution witness to be cross-examined about mandatory minimum life sentence he faced absent cooperation held harmless beyond a reasonable doubt where, inter alia, prosecution's case was strong and jury was instructed to view the testimony of the cooperating witnesses with greater caution than that of other witnesses].)

For these reasons, it is apparent the claimed errors at best had only a slight, if any, impact on the jury's understanding of the magnitude of leniency father's plea bargain secured him and also, as a practical matter, did not restrict the jury's ability to consider this in judging his credibility. (See, e.g., *People v. Masters* (2016) 62 Cal.4th 1019, 1068 [no reasonable probability of a different result had full details about informant's agreement with prosecution been disclosed where, inter alia, "the gist of the agreement—information in exchange for safety—was known to [defendant] and heard by the jury," informant's testimony was merely corroborative and his "credibility was thoroughly attacked at trial"].)

Moreover, Doe's testimony about the sexual abuse, while not corroborated by any physical evidence, was corroborated by the undisputed circumstances in which he revealed it. Doe's mother described him blurting out in a burst of anger at his father that defendant had sexually abused him too. This was corroborated by the testimony of Vincent, to whom mother and Doe first reported the abuse.

Doe's recollection of the abuse also was quite detailed in many respects. For example, he recalled the first incident between defendant and his father down to the dim flicker from a television screen and Christmas tree lights, as well as the very television show the three of them had been watching when the oral sex began in front of him. He also remembered he had been watching cartoons in the living room in the middle of the day right before he was called into the bedroom to have sex for the first time with defendant. Doe also remembered specific things that were said on various occasions ("Ner wants to try that out too"; his father's comment in Spanish about defendant's "nice ass"; defendant "kept on saying I had a hard dick"; defendant said he liked what they were doing, it was fun and they should do it more often).

The defense attacked Doe's credibility based on his inability to remember various specifics, such as how many times he had sex with his father before defendant became involved. However, in terms of the overall picture of what had happened to him—by whom, how, generally when and where—he unequivocally recalled a long period of sexual abuse, regularly carried out by defendant in concert with his father.

For all of these reasons, we conclude that none of the errors defendant has raised concerning father's plea agreement had an impact on the jury's

verdict and were, individually and cumulatively, and beyond a reasonable doubt, harmless.

## II.

### *Child Sexual Abuse Accommodation Syndrome Evidence*

Next, defendant challenges the admission of testimony from the prosecution's expert witness, Dr. Urquiza.

### A.    Background

As noted, Dr. Urquiza was qualified as an expert in child sex abuse, knew nothing about the facts of this case, offered no opinion as to whether Doe had been sexually abused, and testified it would not be appropriate for him to formulate an opinion about that.  He testified generically about typical behaviors in children who have been sexually abused, which he explained to the jury is commonly referred to as Child Sexual Abuse Accommodation Syndrome (CSAAS).

Dr. Urquiza testified that CSAAS is a concept that originated in 1983 in professional literature, in order to educate mental health professionals about the common characteristics of children who have been sexually abused in order to dispel misperceptions and assist in the clinical treatment of child sex abuse victims.  The article that pioneered the concept was based on work with children who had been sexually abused.  He described CSAAS as an "educational tool" for therapists, and testified it is not a diagnosis or a mental health disorder.

Dr. Urquiza outlined the five components of CSAAS and explained what each entails.

The first is secrecy.  He testified that most children are sexually abused by someone they know, and a variety of strategies are used to prevent children from revealing the abuse, including threats (including tacit threats) and coercion. He also testified children are naturally inclined to keep sex

abuse secret out of shame, embarrassment, guilt or fear. Ninety percent of children, he testified, keep the abuse secret at least for some period of time.

The second component is helplessness. Dr. Urquiza testified that children who are sexually abused don't fight back or resist, and that the power imbalance is particularly acute when the perpetrator is an authority figure who lives with the child.

The third component is entrapment and accommodation. This, he testified, means that a child can't stop the abuse and thus becomes entrapped. And then the child must find ways to cope with (or "accommodate") all of the trauma and painful feelings the abuse inflicts. One way a child does that, he testified, is by disassociating, which he described as a child becoming detached from what's happening and suppressing their feelings, and doing so to such an extent that children who are sexually abused often appear outwardly to be perfectly normal. He testified that disassociation is more typical in children who have been sexually abused repeatedly rather than a single time, and that roughly three quarters of children talk about their experience of being sexually abused without appearing to become distraught or upset.

The fourth component is delayed and unconvincing disclosure. Dr. Urquiza testified that the research demonstrates that most children significantly delay revealing sexual abuse; in one study, approximately three quarters of all children kept the abuse secret for a year. He testified there is some controversy, though, as to whether children who are abused tend to reveal their abuse all at once or, instead, gradually. Those who do reveal their abuse gradually tend to be perceived as unconvincing, "because it is different the first time, [and then] the second time." He testified that whether a child discloses abuse gradually or more rapidly probably depends

35

on a number of factors, such as a child's age, the nature of their relationship to the abuser, the length of time they were abused and whether any threats were involved.  He also testified that most victims of child sex abuse experience feelings of embarrassment, shame and guilt that affect their ability to disclose details.

Asked whether children's reports of sexual abuse commonly contain inconsistencies, Dr. Urquiza confirmed that they sometimes do regarding the exact timing and frequency of abuse and regarding details that are peripheral.  He explained: "[I]t happens often that kids may not be accurate in providing information.  We know that victims are really quite good, even as young as three years or seven years of age, . . . [at] being able to describe what they saw and what happened to them.  Where they struggle would be on details, sort of more distal kind of things.  If you're being forced to orally copulate somebody, are you attending to what color shoes they are wearing?  Probably not.  So those kinds of details are difficult and if we call those inconsistences, well maybe, but they are just not a focus of attention.

"Kids also have difficulty with intangibles.  Time is an intangible.  How long something lasted is a really tough question for a child.  If you have been abused once, frequency is not an issue.  It's only happened once.  But if you have been abused, you know, 30 times, 50 times, 100 times[, then] being able to identify—because again these [*sic*] are not what kids want to think about.  They don't want to remember them, so being able to describe either how many times all together you have been abused or being able to say this is what happened on the twenty-third time and not the twenty-fourth time is really just unreasonable.  And so, those types of characteristics are really tough for kids to report with any accuracy."

The fifth component is retraction. Dr. Urquiza testified that in about 20 to 25 percent of cases, children who were sexually abused recant their allegations, usually because of family pressure.

Dr. Urquiza also testified that it's not uncommon for a child to have a positive relationship with the perpetrator if the child can successfully compartmentalize their feelings about the abuse, especially if the perpetrator has an important, positive role in the child's life apart from the abuse. He testified that other people who are close to the child, such as another parent or family member, often are unaware of the sexual abuse going on.

Dr. Urquiza was cross-examined at some length about whether CSAAS is a medical "syndrome." He testified that it constitutes a pattern of events that tend to co-occur, but declined to offer an opinion as to whether it met the legal definition or medical definition of a syndrome because he wasn't competent to do that.

Dr. Urquiza also testified on cross-examination that CSAAS "should not be used to make a determination as to whether a child was abused or not." At some length, he explained it is not the role of mental health professionals to determine whether a child has been sexually abused or to offer such an opinion in court. The responsibility for deciding whether a child has been abused, he emphasized, rests solely with juries.

At the conclusion of trial, the jury was instructed with CALCRIM No. 1193 ("Testimony on Child Sexual Abuse Accommodation Syndrome"). In full, it stated: "You have heard testimony from Dr. Anthony Urquiza regarding child sexual abuse accommodation syndrome. [¶] Dr. Anthony Urquiza's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not John

37

Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of his testimony."

## B.    Analysis

Defendant acknowledges that CSAAS testimony is admissible under current law.  In particular, he recognizes that in *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), the California Supreme Court approved a series of appellate decisions establishing the rule that "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident . . . is inconsistent with his or her testimony claiming molestation." (*Id*. at p. 1300.)  As stated by one of the leading authorities approved by *McAlpin*, "[t]he evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394 (*Bowker*).)  *McAlpin* explained that such testimony " 'is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id*. at p. 1301.)[18]

Defendant acknowledges we are bound by *McAlpin*.  Nevertheless, he argues the trial court erred in admitting Dr. Urquiza's testimony for several reasons.[19]

---

[18]  *McAlpin* extended this rule to expert testimony concerning the behaviors of a child sex abuse victim's *parent* (in that case, expert testimony explaining why parents sometimes do not report a known crime of child molestation).  (See *McAlpin, supra*, 53 Cal.3d at pp. 1301-1302.)

[19]  Prior to trial, defendant unsuccessfully moved in limine to preclude CSAAS evidence on the grounds it was irrelevant, inadmissible under Evidence Code section 801, subdivision (a) because it would not assist the

First, he argues Dr. Urquiza's testimony was not relevant. There was no dispute Doe was abused by his father and delayed reporting that abuse. Therefore, he argues, testimony about children's delayed disclosure of sex abuse (and related concepts of helplessness, accommodation, and entrapment) was not relevant. Moreover, he argues, Dr. Urquiza's testimony did not address the scenario in which a child who has indisputably been victimized by one person also accuses someone else of sexual abuse.

"[T]he decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' " (*McAlpin*, *supra*, 53 Cal.3d at p. 1299.) Defendant has not established an abuse of discretion. Although it was undisputed Doe had been abused by his father, delayed disclosure was by no means a non-issue. Dr. Urquiza's testimony on that subject did not concern delays in reporting just the fact of abuse but also the details. Regardless of the fact Doe accused multiple perpetrators, Dr. Urquiza's testimony about that was directly relevant, because on cross-examination the defense sought to impeach Doe's credibility concerning his accusations against *defendant* in part by highlighting facts Doe had not previously mentioned in any of his prior accounts. Moreover, Dr. Urquiza's testimony was not limited to delayed disclosure. He also testified about children's difficulty recalling certain details of sex abuse, and their tendency to sometimes give inconsistent accounts. That aspect of his testimony was directly relevant to the defense's impeachment efforts as well. The defense vigorously attacked Doe's credibility by cross-examining him about contradictory accounts he had given, ranging from minor details (such as whether it was on a couch or in the bedroom that he first saw his father

trier of fact, inadmissible under Evidence Code section 352, and on federal due process grounds.

39

and defendant having sex, and in which apartment) to details about the timing, frequency and duration of the sex abuse. This theme was a major focus of defense counsel's closing argument, where she argued there were "large inconsistencies about acts, times and events." In short, Dr. Urquiza's testimony tended to rehabilitate Doe's credibility in at least two principal ways. "It follows that the trial court did not abuse its discretion in admitting the challenged testimony." (*McAlpin*, at p. 1302; see also *People v. Wells* (2004) 118 Cal.App.4th 179, 190 [Dr. Urquiza's CSAAS testimony "was admissible . . . because [victim's] testimony on direct and cross-examination revealed she had not immediately reported the alleged abuse, and when she eventually did tell adults her disclosures were piecemeal and sometimes contradictory in the details," and jury was given appropriate limiting instruction regarding Urquiza's testimony].)

Second, defendant asserts without elaboration that even if Dr. Urquiza's testimony was relevant its probative value was substantially outweighed by the danger it would confuse the issues and mislead the jury (see Evid. Code, § 352), particularly because the standard jury instruction given in this case (CALCRIM No. 1193) was illogical and contradictory. This argument is undeveloped and therefore fails to demonstrate an abuse of discretion. Further, as was true in a recent published case that upheld the admission of Dr. Urquiza's testimony in another prosecution for child sex abuse, his "testimony was relatively short and benign as compared to the highly relevant explicit details of the sexual offenses [the victim] testified about," "the prejudicial impact of Urquiza's testimony was also reduced because Urquiza testified that he knew no facts about this case," and "[n]o reasonable juror could believe his testimony was an attempt to prove [defendant] committed the charged offenses" because he testified that he was

40

not offering any opinion on that subject. (*People v. Munch* (2020) 52 Cal.App.5th 464, 474-475 (*Munch*) [no error under Evidence Code section 352].) In addition, CALCRIM No. 1193 has been upheld as a correct statement of law. (See *Munch,* at pp. 473-474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504.) " 'The purpose of CSAAS is to understand a child's reactions when they have been abused. [¶] A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested. *The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior.* Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction.' " (*Munch*, at p. 474.)

Next, defendant urges this court to revisit the admissibility of CSAAS testimony for two reasons. First, he argues *McAlpin* and related authorities upon which it rests rely on outdated assumptions about juror misconceptions concerning child sex abuse. We are bound by *McAlpin,* however, and decline defendant's invitation to question its continued validity.[20] (See *Munch*, *supra*, 52 Cal.App.5th at p. 468 [rejecting similar argument].)

Second, defendant argues Dr. Urquiza's testimony was inadmissible under the *Kelly/Frye* doctrine (see generally *People v. Peterson* (2020)

---

[20] Solely for purposes of further review, he also argues *McAlpin* and related authorities were wrongly decided.

10 Cal.5th 409, 444 [summarizing doctrine]).[21]  Defendant contends the California Supreme Court has never held that CSAAS testimony satisfies *Kelly/Frye*, and argues it does not.  However, the courts of appeal have consistently held that *Kelly/Frye* does not preclude the use of CSAAS evidence when, as here, it is not offered to prove the fact of abuse but offered solely to rehabilitate a child's credibility.  (See *Munch*, *supra*, 52 Cal.App.5th at pp. 472-473; *People v. Harlan* (1990) 222 Cal.App.3d 439, 444-445, 448-449; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 734-735; *Bowker*, *supra*, 203 Cal.App.3d at pp. 391-394; *People v. Gray* (1986) 187 Cal.App.3d 213, 218-220.)  The Supreme Court cited several of these decisions favorably in *McAlpin*.  (See *McAlpin*, *supra*, 53 Cal. 3d at pp. 1300-1301 and fn. 4 [citing *Bowker*, *Gray*, *Harlan* and *Sanchez*].)

This well-established limitation on the use of CSAAS evidence is in fact rooted in the *Kelly/Frye* doctrine.  Its origins have been thoroughly traced in the caselaw, and so we will not revisit that subject in depth.  It is derived from a decision by the Supreme Court concerning the admissibility of evidence of rape trauma syndrome, *People v. Bledsoe*, *supra*, 36 Cal.3d 236, that announced a limitation on the use of such evidence in order to comport with *Kelly/Frye*.  *Bledsoe* held such evidence is not admissible to prove that a complaining witness was raped (because it is not relied on in the mental

---

[21]  The People argue this issue was forfeited, and that defense counsel was not ineffective by failing to raise *Kelly/Frye* issue below.  Although this precise ground was not raised below, it is proper for us to consider the issue because defendant's relevance objections below are closely connected to the reliability issue under *Kelly/Frye*, and the trial court denied defendant's request for an Evidence Code section 402 hearing at which the adequacy of the foundation for the CSAAS evidence could have been fully explored.  (See *People v. Bledsoe* (1984) 36 Cal.3d 236, 246-247 (*Bledsoe*) [*Kelly/Frye* issue held preserved].)

health field as a method for determining that question) (*id.* at p. 251), but acknowledged it may be introduced when the defense claims the complaining witness's subsequent conduct is inconsistent with a claim of sexual assault, in order to rebut the inference of inconsistency by "disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths" (*id.* at pp. 247-248).[22] The appellate courts then extended the *Bledsoe* rule to CSAAS evidence, precluding its use under *Kelly/Frye* to prove that child sexual abuse occurred (because mental health professionals do not rely on it to assess that question), but allowing its admission to dispel misconceptions about how children react to sexual abuse in order to show the victim's behavior is not inconsistent with having been sexually abused. (See, e.g., *Bowker*, *supra*, 203 Cal.App.3d at pp. 391-394.) Assuming without deciding that *Kelly/Frye* applies to CSAAS evidence (see footnote 22, *ante*, p. 43), its use solely for rehabilitative purposes does not offend *Kelly/Frye*.

Defendant also argues that the erroneous admission of Dr. Urquiza's testimony rendered his trial fundamentally unfair, violating his right to due process. But, as we have explained, there was no state law error, and "as a general matter, the federal Constitution does not mandate particular rules concerning the admission of evidence." (*People v. Fuiava* (2012) 53 Cal.4th 622, 697.) The "introduction of CSAAS testimony does not by itself deny appellant due process." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1747.)

---

[22] The Supreme Court later observed that *Bledsoe* "did not hold that the *Kelly/Frye* test applied to the expert opinion in that case" but rather "*assum*[*ed*]*, like the parties* [*on appeal*]*, that the test did apply*" and "simply concluded that the prosecution would not be able to prove that rape trauma syndrome was generally accepted by the counseling community to prove criminal guilt." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1161.)

Moreover, defendant has failed to show how his trial was rendered fundamentally unfair by the introduction of CSAAS testimony "after a rigorous defense cross-examination calling into question the victim's credibility." (*Ibid.*)

Finally, any error in admitting Dr. Urquiza's testimony was clearly harmless. (See *Bledsoe, supra*, 36 Cal.3d at p. 252 [applying *Watson* standard to erroneous admission of rape trauma syndrome evidence]; *Sanchez, supra*, 208 Cal.App.3d at p. 736 [applying *Watson* standard to claimed error in the admission of CSAAS testimony]; *People v. Wilson* (2019) 33 Cal.App.5th 559, 571-572 [*Chapman* standard held inapplicable to erroneous admission of expert testimony concerning false allegations of child sexual assault].) Dr. Urquiza told the jury he had no information about Doe and was not offering an opinion as to whether abuse occurred—a point stressed by the defense in closing arguments. In addition, his testimony was couched only in general terms, describing child sexual abuse victims as a class. And the court instructed the jury it was not evidence that defendant committed the alleged abuse. So it is highly unlikely the jury interpreted his testimony as vouching for the truthfulness of Doe's account, as opposed to simply helping the jury understand that delays in disclosing the details of abuse and/or inconsistencies in a child's accusations are not features *only* of fabricated charges. (See *People v. Housley* (1992) 6 Cal.App.4th 947, 956-957, 958-959.)

To the extent defendant asserts the evidence was prejudicial because Dr. Urquiza was permitted (over defense objection) to refer to CSAAS as a "syndrome," we do not agree. Juries are not "incapable of evaluating properly presented references to psychological 'profiles' and 'syndromes.' " (*People v. Stoll, supra*, 49 Cal.3d at p. 1161, fn. 22.) Dr. Urquiza used that terminology

44

infrequently, and he testified quite clearly (and more than once) that CSAAS is not a diagnosis or a mental health condition.

There also is no indication the jury was unduly influenced by Dr. Urquiza's testimony. The prosecutor hardly mentioned it in closing argument. Although she alluded briefly to his testimony, she offered an even more powerful explanation for Doe's memory failures: likening the situation of repeated abuse to tying one's shoes every day, she argued nobody can be expected to remember exactly how they tied their shoes last week or where they were sitting when it happened.

The only suggestion in closing argument that Dr. Urquiza's testimony was being offered to prove that abuse occurred was made by *defense counsel*,[23] who also focused on Dr. Urquiza's testimony to a far greater degree than the prosecutor and argued it was unhelpful and irrelevant. In rebuttal, the prosecutor simply responded, "[W]e're not talking about Dr. Urquiza, who, no[,] can't tell you whether or not somebody was abused, but can give you an understanding of how to evaluate somebody who has been abused." The jury did not request a readback of Dr. Urquiza's testimony and did not inquire about the jury instruction limiting its use.

For these reasons, it is not reasonably probable that the admission of Dr. Urquiza's expert testimony affected the judgment.

## III.

### *Claims of Prosecutorial Misconduct*

Defendant argues the prosecutor committed prejudicial misconduct in summation in two ways. One, he argues she prejudicially misstated the

---

[23] Defense counsel asserted, "what the prosecution attempted to do with this expert is to state that John's inability to be consistent is consistent with being molested."

reasonable doubt standard.  Second, he argues the prosecutor improperly commented on his decision not to testify.

### A. Alleged Misstatement of Reasonable Doubt Standard

#### 1. Background

At nearly the end of her closing argument, the prosecutor addressed the reasonable doubt standard as follows:

"Now, the law recognizes that anything in human life is possible but not everything is reasonable.  Could be that lightning strikes here in 30 seconds but there's not a cloud in the sky outside.  So, is that reasonable?  Because anything is possible but to prove this case to you it has to be beyond a reasonable doubt.  Nothing has contradicted what John has told you happened in this case.

"Proof beyond a reasonable doubt leaves you with an abiding conviction that the charge is true.  Doesn't need to eliminate all doubt because everything in life is open to some possible or imaginary doubt.  So I don't have to prove this case beyond absolutely any doubt.  *But if it's reasonable then it has been proven to you*."  (Italics added.)

No objection was made.

#### 2. Analysis

Defendant argues the prosecution's statement that "if it's reasonable then it has been proven to you," is a misstatement of law because it urged the jury to convict based only on a "reasonable" view of the evidence, which is improper under *People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*).  Acknowledging there was no contemporaneous objection, defendant asks us to exercise our discretion to reach the merits and, in the alternative, contends defense counsel was ineffective for failing to object.  The People urge us to deem the issue forfeited for lack of an objection (see *Centeno, supra*, 60 Cal.4th at p. 675) and dispute the ineffectiveness claim.  It is unnecessary

46

to consider the claim of ineffective assistance of counsel because, exercising our discretion to consider this issue, defendant has not demonstrated any error.

In evaluating a claim of improper argument to the jury, the prosecutor's remarks cannot be judged in isolation. *Centeno* explained: "the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*Centeno*, *supra,* 60 Cal.4th at p. 667.) Moreover, when it is contended the prosecutor has misstated the reasonable doubt standard, "we assess each claim of error on a case-by-case basis." (*Ibid*.)

Defendant has not demonstrated it is reasonably likely the jury understood the prosecution to be urging it to convict him because the prosecution's evidence was "reasonable." *Centeno* is distinguishable. Unlike here, the prosecutor in that case delivered lengthy remarks about what was "reasonable to believe," bolstered by the use of an improper visual aid depicting the reasonable doubt standard that was both unsupported by the evidence and misleading. (*Centeno, supra,* 60 Cal.4th at pp. 670-672.) By contrast, the challenged conduct here consists merely of a single sentence during the prosecution's summation ("if it's reasonable . . . ") that is vague ("it") and therefore ambiguous. In arguing there was error under *Centeno*, defendant construes the prosecutor's statement in isolation as definitively meaning "*if it's a reasonable conclusion* then [this case] has been proven to you." But in context of the prosecutor's immediately preceding comments— which both correctly stated the reasonable doubt standard and,

47

grammatically, referred to the concept of "doubt"—the jury most likely would have understood the prosecutor meant that *"if it's beyond a reasonable doubt* then [this case] has been proven to you."

The likelihood the jury would have understood the prosecutor's statement this way is bolstered by the arguments of counsel and the jury instructions. As noted, the challenged remark occurred at practically the end of the prosecutor's closing argument. Defense counsel then began her closing argument (after a recess) by emphasizing the importance of the reasonable doubt standard and explaining that it did *not* entail what the defense now argues the prosecution improperly had suggested that it did. She argued:

"Now, in order to determine whether or not [defendant] committed these crimes the standard of proof, now this is the standard that you came into for voir dire, it's a standard if you remember the first day that you were here the judge read to you,[24] this is a standard you were questioned about when you initially came in here.[25] This was a standard that was discussed by the prosecutor in her opening. The reason why this is of utmost importance is because this is the high standard that you have to hold the prosecution to in determining the evidence in this case. *It's not if a defendant may have committed a crime, a defendant could have committed a crime, a defendant likely committed a crime, a defendant more than likely committed a crime, those aren't the standards, not even the defendant committed the crime. That's not the standard.* The standard is, did the defendant commit the crime

---

[24] The trial court instructed the jury concerning the reasonable doubt standard before trial began, in a set of introductory instructions given to the newly empaneled jurors before opening statements.

[25] This was accurate too. In addition, at the beginning of jury selection the trial court instructed prospective jurors concerning the reasonable doubt standard.

beyond a reasonable doubt. And that's why it has been told to you over and over and over again. *This is not a standard that we use in every day life* and people have different standards of when they believe someone may have done something. So, when you look at the standard, the question becomes whether or not the prosecution has met their burden beyond a reasonable doubt.

"Now, in looking at this case, . . . there's going to be some jury instructions you're going to get. The judge is going to read them to you after our argument. Those instructions are going to be the law that you follow when you deliberate . . . ." (Italics added.)

In rebuttal, the prosecutor did not take issue with those remarks or comment further about the reasonable doubt standard.

After closing arguments, the court instructed the jury. The instructions included CALCRIM No. 220 concerning the requirement of proof beyond a reasonable doubt.

In light of the ambiguity of the prosecutor's statement, which immediately followed the prosecution's *correct* articulation of the reasonable doubt standard, the substance of defense counsel's argument after the challenged remark, and the fact the jury was correctly instructed about the reasonable doubt standard multiple times at trial, both before and after the challenged remark, defendant has not demonstrated the jury likely would have understood the prosecutor's ambiguous remark as an invitation to convict defendant merely on the basis of a "reasonable" belief in his guilt. Other than defense counsel's failure to object to the prosecutor's closing argument, the facts here bear no resemblance to those of *Centeno*.

## B.    Alleged *Griffin* Error

The Fifth Amendment, made applicable to the states under the Fourteenth Amendment, prohibits a prosecutor from commenting on the

49

accused's decision not to testify. (*Griffin v. California* (1965) 380 U.S. 609, 615 (*Griffin*).) "Pursuant to *Griffin*, it is error for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her own behalf." (*People v. Hughes* (2002) 27 Cal.4th 287, 371.) Here, defendant contends the prosecutor committed *Griffin* error in closing argument by repeatedly stating that John Doe's testimony about the acts of sexual abuse was "uncontradicted."[26]

No *Griffin* error occurred. Father was a percipient witness to every accusation Doe made about defendant, and so this is not a case in which the evidence "could not be contradicted or refuted by anyone other than the defendant." (*Hughes*, *supra*, 27 Cal.4th at p. 371.) That is true even of the final accusation of abuse, when, according to Doe, he and defendant had oral sex alone one evening while father was out running an errand. Father testified that when he (father) returned home, he heard the two of them through the locked bedroom door, described trying to barge in on them and his son screaming "wait," and testified it took about five minutes for the two to emerge from behind closed doors after he threatened to break the door down, and he thought they were having sex.[27] Father could have

---

[26] For example, defendant highlights one passage where the prosecutor argued, "the evidence was clear, John was very clear, and *none of the other witnesses contradicted* the fact that he put his penis inside of [defendant's] anus, or that [defendant] and John engaged in oral copulation, masturbation and sodomy over a long period of time, or that a final act of oral copulation happened when John was fifteen. [¶] *The single witness is uncontradicted in that way*." (Italics added.)

[27] He testified: "And I went there and I don't see Santos. I don't see my son. I see my door from my bedroom lock, and I went try to open the door and I say, hey, open the door John—sorry, son, open the door. Open the door. He doesn't open the door. I said what going on. And he scream to me say,

contradicted Doe by testifying that he observed or heard nothing amiss when he returned, but did not.  Defendant concedes elsewhere in his brief that father's testimony corroborated the oral copulation charge.  So, in arguing that Doe's testimony was uncontradicted even as to that incident, the prosecutor was not commenting indirectly on defendant's failure to testify.  Her arguments were merely "fair comment on the state of the evidence" which does not violate *Griffin*.  (See *Hughes,* at p. 373.)  Even defendant tacitly acknowledges this.  He states the prosecutor "referred to Doe's testimony, repeatedly, as 'uncontradicted,' when [defendant] was the only person in a position to contradict Doe *and* [*father*]."  (Italics added.)

*People v. Medina* (1974) 41 Cal.App.3d 438, cited by defendant, is distinguishable.  Unlike in that case, the prosecutor did not argue here that all of the percipient witnesses who testified were uncontradicted by anyone else (i.e., thereby commenting indirectly on an invocation of Fifth Amendment rights).  (See *Medina,* at p. 457.)  She argued that *Doe* was not contradicted in material respects.  There is not a "reasonable likelihood" the jury would have understood the prosecutor's argument as a comment on defendant's decision not to testify.  (*People v. Lewis* (2001) 25 Cal.4th 610, 671; see *People v. Carr* (2010) 190 Cal.App.4th 475, 484 ["Ordinarily, when an ambiguous remark is challenged under *Griffin*, we determine ' "whether

_____

wait.  I say, no, what is going on, who is there.  And I hear the coughing, that is always [defendant] has.  And I say, hey, what you doing guys over there with the door lock.  I say, if you don't open the door I wanna [break] the door.  And I take it like probably five minutes to try to open the door and I get very hesitated (sic) and I get really upset that day.  And finally, open the door and I see that both hesitated dress but hesitated—I don't know what he doing. . . . [¶] . . . [¶] I think something happened [sexually] because the door was closed."

there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion" ' "].)

## IV.

### *Overlapping Convictions for Continuous Sex Abuse (Penal Code section 288.5) and Sodomy (Penal Code section 286(c)(1)) During the Same Time Period*

Defendant argues the trial court erred in permitting his conviction for continuous sex abuse (§ 288.5) that overlapped during the same time period with his convictions on two counts of sodomy with a person under 14 (§ 286, subd. (c)(1)).

The People concede this error, and the concession is appropriate. A defendant may not be convicted of both continuous sex abuse under section 288.5 and specific sex offenses that occur during the same period of time. (*People v. Johnson* (2002) 28 Cal.4th 240, 248 (*Johnson*); § 288.5, subd. (c) [discrete acts involving same victim cannot be charged "in the same proceeding with a charge under this section unless the other charged offense occurred outside the time period charged under this section or the other offense is charged in the alternative"].) Yet that is what occurred here after the trial court permitted the prosecutor to amend the information to modify the dates of these three charges, without also instructing the jury in some fashion that the sodomy charges and the continuous sex abuse charge were in the alternative.

The only question is the appropriate remedy.

Below, defense counsel asked the trial court (twice) only to dismiss the two sodomy counts: both when the information was amended, at then later at sentencing. On appeal, however, he asks us to reverse and remand for a new trial on these three charges; or, in the alternative, to vacate the continuous sex abuse conviction (count 8) and, in the alternative, to vacate

the sodomy convictions.  The People urge us to affirm the continuous sex abuse conviction and vacate the two sodomy convictions.

We agree with the People.  First, defendant cites no authority authorizing, or even suggesting, the remedy of a new trial when a defendant is erroneously convicted of both continuous sex abuse and specific sex offenses during the same period.  On the contrary, our Supreme Court has said that in this situation, "either the continuous abuse conviction or the conviction on the specific offenses must be vacated." (*Johnson, supra*, 28 Cal.4th at p. 245.)  Although the Supreme Court has not addressed how appellate courts are to decide which conviction(s) to vacate, the unanimous view among appellate courts, beginning with *People v. Torres* (2002) 102 Cal.App.4th 1053 (*Torres*), is that the defendant should remain convicted of the offense that is most commensurate with his culpability.  (*Torres*, at pp. 1059-1060; accord, *People v. Wilson* (2019) 33 Cal.App.5th 559, 574 (*Wilson*); *People v. Rojas* (2015) 237 Cal.App.4th 1298, 1308-1309; *People v. Bautista* (2005) 129 Cal.App.4th 1431, 1437 (*Bautista*).)  "This will ordinarily translate to upholding whichever conviction resulted in the greater aggregate penalty and vacating the less serious count." (*Rojas,* at p. 1309.)

Here, the trial court imposed the midterm of six years for each of the two sodomy counts and stayed sentence on them under section 654.  It designated the continuous sex abuse charge (count 8) the principal offense and imposed the maximum sentence of 16 years.  The court stated it was doing so because "[t]his particular victim was truly a victim" under all the facts and circumstances.  The court said it was "particularly disturb[ed]" by father's testimony, which the court did not find particularly credible.  "[I]t appeared to me that [father] was actually coloring his testimony for [defendant], basically saying that the victim wanted to have sex with

53

[defendant], trying to alleviate any blame on [defendant] and throwing it on his son."

The record thus reflects the trial court exercised its sentencing discretion by determining that serving punishment on the continuous sex abuse charge, rather than the sodomy counts, was most commensurate with defendant's culpability. Accordingly, we will order defendant's convictions on counts 5 and 6 vacated, along with the fines and fees associated with those counts.[28] (See *Torres, supra*, 102 Cal.App.4th at p. 1060 [where trial court imposed a greater maximum sentence on the individual sex offenses and stayed execution of sentence on the section 288.5 count, appropriate remedy was to vacate defendant's section 288.5 conviction]; *Bautista, supra*, 129 Cal.App.4th at pp. 1434, 1437-1438 [vacating convictions for specific sex offenses where trial court imposed middle term on continuous sex abuse charge and stayed sentence on four counts of individual sex offenses; defendant "has not suggested how . . . convicting [her] only of [four counts of] procurement is in any way proportionate to the egregious criminal conduct in which she engaged"].)

Defendant acknowledges the rule of *Torres* and its progeny but advances several reasons we should vacate his continuous sex abuse conviction rather than his sodomy convictions. He notes that in *Johnson* the Supreme Court left standing the conviction with a *shorter* aggregate sentence (in that case, the continuous sex abuse charge). The choice of which

---

[28] Defendant asserts, without contradiction by the People, that this requires an $80 reduction in the court operations assessment imposed under section 1465.8 (from $200 to $120); a $1,000 reduction in the sex offender fine imposed under section 290.3 (from $2300 to $1300); and a $60 reduction in the court facilities assessment imposed under Government Code section 70373 (from $150 to $90). We agree.

54

conviction to vacate was not at issue in *Johnson*, however. (*Wilson, supra*, 33 Cal.App.5th at p. 574.) Indeed, by defendant's logic, *Johnson* would require us to affirm his section 288.5 conviction and dismiss the discrete sex offense convictions, as was done in that case.

Defendant also argues it would be unfair to apply the *Torres* rule by dismissing the sodomy charges rather than the continuous sex abuse charge (even though that is what he requested below), because the prosecutor and the trial court "flouted *Johnson*" and avoided the risk that a properly instructed jury would have convicted him only of the two discrete counts of sodomy and acquitted him of the continuous sex abuse charge. That is circular logic. The same could be said of any *Johnson* error.

Finally, defendant argues there is a reasonable probability that a properly instructed jury would have acquitted him of the continuous sexual abuse and convicted him only of the two sodomy counts had the jury been properly instructed that the counts could be charged only in the alternative. We do not agree. The continuous sex abuse conviction required a finding of "three or more" acts of substantial sexual conduct (§ 288.5), which the jury instructions defined as oral copulation, masturbation or penetration. Had the jury been told it could not convict defendant of both the continuous abuse charge and the two sodomy charges, there is no reason to think it would have convicted defendant of engaging in only *two* unlawful sex acts (i.e., the two sodomy counts) rather than three (i.e., the predicate acts for the continuous sex abuse charge). Assuming without deciding an instruction should have been given, any error in failing to instruct was therefore harmless.[29]

---

[29] The parties both assert the court should have given CALCRIM No. 3516, an instruction promulgated by the Judicial Council applicable when the defendant is charged in the alternative with multiple counts (such

55

(Cf. *Wilson*, *supra*, 33 Cal.App.5th at p. 574 [no likelihood jury would have acquitted defendant of 12 sex offenses had it been properly instructed they were charged alternatively to continuous sex abuse charge and so error in failing to instruct as to alternative nature of charges held harmless].)

**V.**

***Defendant's Conviction for Distributing Harmful Material to a Minor (Penal Code section 288.2)***

Next, defendant raises a number of challenges to his conviction under section 288.2, for distributing harmful material to a minor.

### A. Instructional Error.

First, defendant contends the jury was instructed incorrectly on the specific intent element of this charge, based on the current version of section 288.2, which was not in effect at the time of his charged offense

---

as greater and lesser included offenses, or theft and receiving stolen property).

We are not so sure. As defendant points out, that instruction "provides the jury with no guidance as to whether, if they find all the charges proven beyond a reasonable doubt, they should convict of section 288.5, or of the individual counts." The instruction's accompanying commentary expresses doubt as to whether it should be used in the context here, explaining: "Because the law is unclear in this area, the court must decide whether to give this instruction if the defendant is charged with specific sexual offenses and, in the alternative, with continuous sexual abuse under Penal Code section 288.5. If the court decides not to so instruct, and the jury convicts the defendant of both continuous sexual abuse and one or more specific sexual offenses that occurred during the same period, the court must then decide which conviction to dismiss." (Bench Notes, CALCRIM No. 3516.) The parties have not cited any case approving its use in this context, and we have found none. Whether some modified version of CALCRIM No. 3516 might have been appropriate is not before us, as defendant has not raised that issue.

56

(alleged to have taken place during a four-year period ending January 15, 2012).

Enacted in response to concerns over the use of obscene or indecent matter in the seduction of children (*Hatch v. Superior Court* (2000) 80 Cal.App.4th 170, 176), former section 288.2 in relevant part made it unlawful to send harmful material to a minor "with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, *and with the intent or for the purpose of seducing a minor*."[30] (See former § 288.2, eff. until Sept. 30, 2011 [Stats. 1997 ch. 590], eff. October 1, 2011 to June 26, 2012 [Stats. 2011, ch. 15, § 317], eff. June 27, 2012 [Stats. 2012, ch. 43, § 16], italics added; see also § 313 [defining "harmful matter"].) Its purpose was "to prohibit using obscene material, as defined in section 313, subdivision (a), 'to groom young victims for acts of molestation.'" (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1287.) At issue here is the "seduction" element. The standard Judicial Council jury instruction in effect at the time of defendant's charged crime stated that, "*To seduce a minor* means to entice the minor to engage in a sexual act involving physical contact between the seducer and the minor." (former CALCRIM No. 1140, Fall 2010 edition.) That instruction was not given.

Effective January 1, 2014, section 288.2 was repealed and reenacted in its current form, to provide enhanced penalties where the offense involves child pornography (harmful matter that "depicts a minor or minors engaging in sexual conduct"). (§ 288.2, subd. (a)(1); Stats. 2013, ch. 777, §§ 1, 2.) The revision retained the first aspect of the specific intent requirement—"with the

---

[30] Defendant was charged under section 288.2 for conduct that occurred during the four-year period between January 16, 2008, and January 15, 2012.

intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of the minor"—but replaced the second. Specifically, it replaced the phrase, "with the intent, or for the purposes of seducing the minor" with the phrase, "with the intent or for the purposes of engaging in sexual intercourse, sodomy, or oral copulation with the other person, or with the intent that either person touch an intimate body part of the other . . . ." (§ 288.2, subd. (a)(1).) The jury was instructed under the current version of CALCRIM No. 1140 which included this revised specific intent language. (CALCRIM No. 1140, revised Feb. 2015.) Specifically, the instruction omitted the language about intent or purpose of seducing the minor (and the definition of seduction) and instead required proof that "[w]hen the defendant acted, he intended to engage in sexual intercourse, sodomy, or oral copulation with the other person or to have either person touch an intimate body part of the other person."[31]

Defendant argues this portion of the instruction was erroneous, because the current version of section 288.2's intent element, which was not in effect at the time of his charged crime, is broader than the "seduction" element of former section 288.2. The "seduction" element under the former

---

[31] In relevant part, the instruction stated the People must prove five elements: "1. The defendant distributed harmful material to another person by any means; [¶] 2. When the defendant acted, he knew the character of the material; [¶] 3. When the defendant acted, he knew, should have known, or believed that the other person was a minor; [¶] 4. When the defendant acted, he intended to arouse, appeal to, or gratify the lust, passions, or sexual desires of himself or of the other person; [¶] AND [¶] 5. When the defendant acted, he intended to engage in sexual intercourse, sodomy, or oral copulation with the other person or to have either person touch an intimate body part of the other person." The instruction defined "intimate body part" as "includ[ing] the sexual organ, anus, groin, or buttocks of any person, or the breasts of a female."

law, he contends, requires intent to entice or persuade the minor. The instruction given under the current statute, he argues, does not require enticement.

The error was prejudicial, defendant argues, because there was conflicting evidence about whether defendant gave Doe the videotape when they had already begun engaging in sexual acts together, Doe testified defendant gave him the tape to help him masturbate and Doe admitted he had access to other pornographic videos at his father's house. Given this evidence, "[j]urors might . . . have reasonably questioned whether the particular tape at issue was given to Doe with the specific intent to seduce." Further, the jury asked for clarification about the second specific intent element in the instruction they were given—that "[w]hen the defendant acted, he intended to engage in sexual intercourse, sodomy, or oral copulation with the other person or to have either person touch an intimate body part of the other person"—suggesting the jury was uncertain about its meaning.

The People argue there was no error because, while it would have been better practice to instruct the jury under the CALCRIM instruction then in effect, there is no material difference between the intent requirement of former section 288.5 and the current statute.

The People also argue any error was harmless because the People's theory at trial fell within the seduction statute—specifically, the People argued that defendant gave Doe the videotape "so he could learn to masturbate," "in order to teach him about sex so that they could all continue their sexual interaction." That "he did that to train him, to shape him, to encourage him to do something that feels good. Why? For John's betterment? No. So that John could interact with [father] and [appellant]." "[A]ppellant wanted the tape to help him accomplish the oral copulations and

59

sodomies that took place between he and Doe [*sic*]." That is, he intended "to entice Doe to engage in a sexual act involving physical contact between them."

We conclude there was no error. The current version of section 288.2 encompasses but does not explicitly require an intent to seduce. But, by requiring that when the defendant provides the pornographic material to the minor he do so "with the intent or for the purposes of engaging in" specified sexual acts with the minor, the statute makes a connection between the two. It is difficult to imagine a scenario in which an adult would supply a minor with pornographic material, with the specific intent both to arouse himself or the minor *and* to engage in sexual acts with the minor, but without any intent to entice or lure or groom the minor into engaging in such sexual acts. But the latter is exactly what "seduction" under the former statute was understood to mean. (See, e.g., *People v. Hsu* (2000) 82 Cal.App.4th 976, 985 ["luring minors into sexual contact via . . . communication of harmful material"]; *id*. at p. 992 [" 'persuading into partnership in sexual intercourse' "]; *People v. Jensen* (2003) 114 Cal.App.4th 224, 239 [" 'entic[ing] to sexual intercourse' "]; *People v. Powell*, *supra,* 194 Cal.App.4th at p. 1287 [" 'to groom young victims for acts of molestation' "]; *People v. Nakai* (2010) 183 Cal.App.4th 499, 510 (*Nakai*) ["entice . . . to engage in physical sexual acts with him, be it sexual intercourse or oral copulation"].)

Defendant postulates the jury, if instructed under the former statute, could have found him guilty without any intent to encourage Doe to engage in sexual relations with him because there was evidence from which the jury could infer no encouragement was necessary, namely, Doe's testimony that defendant gave him the tape "around the time that [defendant] began engaging in sex acts with him, to help him masturbate." We disagree, for two

reasons. First, the precise timing of defendant's act of providing Doe with the tape is of little consequence. A child who has been subject to abuse on one or more occasions may still need encouragement to continue engaging in sexual acts, a fact of which adult abusers are no doubt aware. Second, the instruction as given linked *the act of providing the pornographic tape* with the *specific intent* not only to arouse Doe or himself but also *to engage in sexual acts with Doe.* It could not reasonably be understood to delink the specific intent to engage in sex with the child from the act of providing pornography to the child. Both (along with the intent to arouse element) were essential elements of the same crime. The only logical reading of the instruction was to imply a causal link between defendant's act and his specific intent. The defendant provided the pornography with the intent to cause arousal in himself or (more likely here) Doe, and the intent to cause Doe to engage in sexual relations with him, whether for the first time or not.

In short, while we agree that the trial court should have given the instruction provided for the offense as it was defined at the time the offense was committed, we disagree that the instruction for the later amended version of the offense was materially different. For that reason, we reject defendant's instructional error claim.

## B.    The Jury's Note

Near the end of deliberations, the jury sent a note inquiring about the same portion of the instruction. It stated: "Regarding instruction 1140, section 5. We need more clarification on the wording."[32] The court conferred off the record with counsel, and then responded, "I cannot clarify the wording." Defendant now assigns as error the court's refusal to clarify this

---

[32] The relevant portion of this instruction is quoted in footnote 31, *ante,* page 58.

instruction, arguing it violated both state law and his federal constitutional right to a jury determination that he is guilty of every element of the offense, beyond a reasonable doubt.

The People argue, among other things, that defendant can't establish error because the record surrounding the court's refusal to clarify the instruction is silent. We agree.

Trial judges are not required to provide a substantive answer to every question posed by a jury. The applicable law is stated in *People v. Beardslee* (1991) 53 Cal.3d 68 (*Beardslee*): "[S]ection 1138 . . . provides that when the jury 'desire to be informed on any point of law arising in the case, . . . the information required must be given . . . ." The court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] *This does not mean the court must always elaborate on the standard instructions.* Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky. [Citation] . . . But a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury. *It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given.*" (*Id.* at p. 97, first and third italics added.)

In *Beardslee*, the record affirmatively demonstrated that the trial court did not give a jury's note any substantive consideration whatsoever, but simply on principle refused the jury's request for clarification on a point of

law, for fear of getting reversed on appeal.[33]  On that record, the Supreme Court held the trial court erred, not by failing to answer the jury's specific question but by refusing to *consider* whether some further explanation of instructions was required.  (*Beardslee, supra,* 53 Cal.3d at p. 97.)  (The error was held harmless, because the jury's confusion on this point could only have prejudiced the prosecution (*id.* at pp. 97-98).)

Here, by contrast, the record does not show the trial court just refused to consider clarifying the instruction, as in *Beardslee*.  It is true that we do not know why the court declined, after conferring with counsel, to elaborate upon the instructions as to one element of the section 288.5 offense.  But we do know the court discussed the matter with counsel and thus considered whether elaboration was appropriate.  Further, because the instruction was "full and complete," the trial court had discretion to decide no further explanation of the concept was required.  (See *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1213 [no violation of section 1138 where jury asked for clarification of legal definition of malice but trial court advised jury to reread the instruction in the context of all homicide instructions]; accord, *People v. Brooks* (2017) 3 Cal.5th 1, 96-97 [no error in declining to answer jury's request for clarification of sentencing factors and re-reading to jury relevant portions of the standard instruction]; *People v. Moore* (1996) 44 Cal.App.4th

_____

[33]  The jury sent a note that, unlike here, did not ask for clarification of the wording of an instruction but, rather, sought guidance on a principle of law (namely, how the legal requirements of deliberation and premeditation for first degree murder apply to an aider and abettor).  (See *Beardslee, supra,* 53 Cal.3d at p. 97.)  The jury was excused, and then the trial court told counsel (in colorful and emphatic terms) that it was not going to answer the jury's question because trying to explain jury instructions always spells trouble on appeal.  (*Id.* at p. 96.)  The trial court then told the jury that it was not going to explain the instructions, told the jury to consider the instructions as a whole, and to "Do the best you can with them."  (*Id.* at pp. 96-97.)

1323, 1331 ["By advising the jury to reread the . . . instruction, which was full and complete for purposes of the facts before it, the trial court fulfilled its duty under section 1138"]; accord, *People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1542; *People v. Zepeda* (2018) 26 Cal.App.5th 211, 216, fn. 7.)[34]

A separate but related problem with the off-the-record colloquy is that we do not know whether defense counsel agreed that no clarification should be given (for tactical reasons, conceivably she might have done so). If so, her agreement would preclude our consideration of this issue.[35] (See *People v. Medina* (1990) 51 Cal.3d 870, 902 (*Medina*) ["defense counsel's approval of the court's limited response to the jury's inquiry should bar defendant from contending on appeal that a more elaborate response should have been made"]; *Beardslee, supra*, 53 Cal.3d at pp. 116-117 [pursuant to *Medina*, where trial court formulated a response to jury inquiry, asked whether counsel wished to "add" anything to it and defense counsel declined, defense counsel forfeited argument additional clarification should have been given]; *People v. Zepeda, supra*, 26 Cal.App.5th at p. 216, fn. 7 [defense counsel waived error in court's response to jury's inquiry by failing to object].)

---

[34] While it would have been better practice to advise the jury to re-read the instruction in context of the entire text of CALCRIM No. 1140, we are confident the court's failure to do so was harmless beyond a reasonable doubt. The jury had the instructions, continued deliberating for forty more minutes and arrived at a verdict.

[35] To the extent *People v. Thompkins* (1987) 195 Cal.App.3d 244 suggests otherwise, we decline to follow it. (See *id.* at p. 251, fn. 4 [where trial court gave erroneous answer to jury's inquiry after conferring with counsel off the record, "[w]e cannot interpret a silent record including an unreported chambers conference to indicate anything other than trial counsel's failure to object to the judge's instructions," and "trial counsel's failure to object to an error in jury instructions [actually given] does not preclude a defendant from raising the issue on appeal"].)

Citing *Beardslee*, defendant asserts there is no requirement that the defense object when the court refuses to provide a response to a jury's request for clarification of instructions. *Beardslee* does not stand for that proposition. Although in that case the defense did not object when the trial court announced it would not answer the jury's question about the first degree murder instruction and the Supreme Court addressed the merits of that ruling, the Supreme Court did not address the question of forfeiture in that context, and " ' " 'cases are not authority for propositions not considered.' " ' " (*People v. Baker* (2021) 10 Cal.5th 1044, 1109.) Further, in that case, given both the tenor and the substance of the court's remarks to counsel about the jury's note, an objection clearly would have fallen on deaf ears. (See *People v. Hill* (1998) 17 Cal.4th 800, 820 ["[a] defendant will be excused from the necessity of . . . a timely objection . . . if [one] would be futile"]; accord, *People v. Tuggles* (2009) 179 Cal.App.4th 339, 356.) In another portion of *Beardslee* addressing a different jury note, the Supreme Court held defense counsel *did* forfeit the contention the trial court's response to the jury's note was insufficient, by declining the court's invitation to supplement the court's proposed response. (See *Beardslee*, *supra*, 53 Cal.3d at pp. 116-117.)

In sum, defendant has failed to demonstrate the trial court erred.

**C.     Failure to Instruct on the Lesser Included Offense.**

Next, defendant argues the court erred by failing to instruct the jury on exhibiting harmful material to a minor under section 313.1, which is a lesser included offense of section 288.5 that prohibits the furnishing of harmful material to minors but does not require proof of the defendant's specific

intent to arouse and seduce.[36]  (See *People v. Jensen*, *supra*, 114 Cal.App.4th at p. 244; *Nakai, supra,* 183 Cal.App.4th at p. 510).

There was no error in failing to give the instruction, because there was no substantial evidence defendant committed only the lesser offense. (See *Nakai, supra,* 183 Cal.App.4th at p. 510.)  Defendant asserts a reasonable jury might have concluded defendant lacked the intent to seduce Doe when defendant gave him the videotape because the prosecution did not establish defendant provided the tape to Doe *before* the abuse began.  But whether the two already had engaged in sexual contact is irrelevant.  The former statute merely required defendant to share the material with the intent of persuading a minor to engage in sexual contact.  Defendant does not explain why an intent to persuade a minor to *resume* sexual relations does not satisfy the intent element, and we can think of none.

Defendant also argues there was evidence Doe had ready access to pornography at father's house anyway, and so a reasonable juror might have questioned whether this particular tape was given with the intent to seduce Doe.  But evidence of Doe's easy access to other pornographic material does not negate an intent by defendant to seduce him.  In fact, it cuts the other way.  If the jury believed defendant furnished this videotape to Doe despite Doe's access to other pornographic material, it could only conclude defendant had a specific purpose in mind for singling out that particular tape.  The evidence admits of only one conclusion:  to increase the likelihood that Doe would agree to begin, or continue, to have sexual relations with defendant.

---

[36]  It criminalizes the conduct of "[e]very person who, with knowledge that a person is a minor, or who fails to exercise reasonable care in ascertaining the true age of a minor, knowingly sells, rents, distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by any means . . . any harmful matter to the minor . . . ."  (§ 313.1, subd. (a).)

The record does not support a conclusion defendant only wanted to share this videotape with Doe for a reason unrelated to defendant's desire to have sexual relations with Doe. There was thus no error in failing to instruct on the lesser charge. (See *Nakai*, *supra*, 183 Cal.App.3d at p. 510 [affirming].)

Moreover, even if the instruction was warranted by the evidence any error was harmless. There was never any theory put forward that defendant gave the videotape to Doe for some benign purpose, unrelated to sexual gratification. Indeed, defendant's theory of the entire case was that Doe didn't even like defendant, and the two were not close. In closing argument, defense counsel only briefly addressed this charge and disputed only that defendant had given Doe the videotape, not that defendant had given it to Doe for some benign, non-sexual purpose without the intent to seduce Doe. Defendant's theory of the case thus negated only defendant's intent to send harmful material to Doe, not defendant's intent to arouse Doe, which is the only difference between the greater and lesser offense. (See *Nakai*, *supra*, 183 Cal.App.4th at p. 512.) For this reason, "it is not reasonably probable that the jury would have found the defendant guilty of only the lesser offense, because the critical element between the lesser offense and the greater offense was not disputed." (*Ibid*.)

### D. Penal Code section 654

Defendant was sentenced to a consecutive, eight-month term on the section 288.2 count. He argues, at a minimum, his punishment on that count should have been stayed pursuant to section 654 because no substantial evidence supports a finding that in furnishing pornography to Doe, he had any objective other than to commit the sexual offenses of which he was convicted (sodomy and continuous sexual abuse). At oral argument, the People conceded that if we affirm the conviction of the section 288.2 count, the trial court erred in failing to stay it under section 654. We agree. (See

67

*People v. Medelez* (2016) 2 Cal.App.5th 659, 663-664 [People conceded defendant could not be punished for both luring a minor with intent to engage in oral sex and attempted oral sex with the minor, where offenses shared same intent and objective].)

## VI.

### *Cumulative Error*

Defendant argues that, individually and cumulatively, the errors he has raised, and the prejudice resulting from them, denied him a fair trial. But we are ordering his conviction on the two sodomy counts vacated, for the reasons discussed. With regard to the remaining charges, we have concluded that: none of the claimed errors concerning father's incentive to testify favorably based upon his plea agreement prejudiced defendant individually *or* cumulatively; there was no error in the admission of Dr. Urquiza's testimony; no error by the prosecutor in her comments to the jury; and no error with respect to the section 288.2 charge specifically, apart from the court's error in failing to stay defendant's sentence on that count. There is thus "nothing to cumulate." (*People v. Duff* (2014) 58 Cal.4th 527, 562.)

## VII.

### *Fines, Fees and Assessments*

Finally, the trial court imposed a restitution fine pursuant to section 1202.4, subdivision (b)(1) in the amount of $50,000 and a parole revocation fine pursuant to section 1202.45 in the same amount. Defendant argues that both fines exceed the statutory maximum, and also were imposed without regard to his ability to pay, violating his right to due process of law under *People v. Dueñas* (2019) 30 Cal.App.5th 1557, 1164 (*Dueñas*).

Defendant asks us to reverse the imposition of these fines and remand for a new hearing so that he may argue pursuant to *Dueñas* he lacks the

ability to pay even a $10,00 fine.[37]  Defendant also asks for an opportunity on remand to make an argument regarding his ability to pay the other fines and fees the trial court imposed, some of which we are ordering adjusted because we are vacating defendant's convictions on the two sodomy counts (see footnote 28, *ante*, p. 54):  $1837.50 in direct victim restitution (§ 1202.4, subd. (f)), a court operations assessment (§ 1465.8) (set by the trial court at $200, but which we are ordering reduced to $120), a court facilities assessment (Gov. Code § 70373) (set at $150 by the trial court, but which we are ordering reduced to $90), a sex offender fine (§ 290.3) (which we are ordering reduced from $2300 to $1300), and $250 in probation costs (§ 1203.1b).

The People concede that the restitution fine and parole revocation fine exceed the statutory maximum, and the concession is appropriate.  The maximum restitution fine that may be imposed in a single case is $10,000, regardless of the number of counts involved.  (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1534; § 1202.4, subd. (b)(1).)  The parole revocation fine is to be assessed in the same amount as the restitution fine.  (§ 1202.45, subd. (a).)  The People also agree that, on remand, defendant may raise any *Dueñas* issue he wishes concerning the restitution fine.  On remand, therefore, defendant is free to make the constitutional arguments that he believes should be made concerning his ability to pay the fines, fees and assessments imposed.

---

[37]  The constitutional claim of indigency was not raised below but is not forfeited because *Dueñas* was not reasonably foreseeable at the time of defendant's sentencing.  (*People v. Johnson* (2019) 35 Cal.App.5th 134, 137-138.)

## DISPOSITION

Defendant's convictions for violating section 286, subdivision (c)(1) (counts 5 and 6) are vacated. The eight-month sentence for violation of section 288.2 (count 14) is stayed. The fee imposed under section 1465.8 shall be reduced from $200 to $120. The fine imposed pursuant to section 290.3 shall be reduced from $2300 to $1300. The fee imposed under Government Code section 70373 shall be reduced from $150 to $90. The restitution fine imposed pursuant to section 1202.4, subdivision (b)(1) in the amount of $50,000 and the parole revocation fine imposed pursuant to section 1202.45 in the same amount are vacated. The matter is remanded for recalculation of the restitution fine and parole revocation fine, and for further proceedings consistent with this opinion to afford defendant an opportunity to request an ability-to-pay hearing on the fines and assessments imposed by the trial court.

In all other respects the judgment is affirmed. The petition for habeas corpus is denied.

                                                  _____
                                                  STEWART, J.

We concur.


_____
RICHMAN, Acting P.J.


_____
MILLER, J.


*People v. Santos* (A153384, A159050)